IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ANTHONY LIPPA,
Plaintiff,

v.

Civil Action No. 3:25-cv-854

SHERIFF SCOTT MOSER,
et al.,
Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on the Defendants' MOTION FOR SUMMARY JUDGMENT (ECF No. 36) (the "MOTION") and the memoranda in support (ECF No. 37), opposition (ECF No. 48), and reply (ECF No. 49). For the reasons set forth below, the MOTION will be granted.

**BACKGROUND**

**I. Factual Background**

Anthony Lippa is a former sergeant in the Caroline County Sheriff's Office ("CCSO"). ECF No. 17 ¶ 1. In early 2023, while serving in the CCSO, Lippa announced his candidacy for the upcoming election for Clerk of Court for Caroline County. Id. He raises one count under 42 U.S.C. § 1983 for a violation of his First Amendment right against retaliation for running his campaign. Id. ¶ 33-38.

Lippa asserts that three of his superiors, Sheriff Moser, Major Nutter, and Lieutenant Wright, collaborated to punish and humiliate him as retribution for his candidacy. See id. ¶¶ 2-3. Lippa alleges that between April and August 2023, Moser, then

running his own campaign for reelection, said that he was being pressured by his superiors about Lippa's campaign and that he was irritated by that pressure.[1] ECF No. 48, at 2. Lippa cites five incidents as evidence of retaliatory actions motivated by Moser's supposed disapproval of Lippa's candidacy.

First, Lippa alleges that Moser instructed office supervisors in June 2023 to inform their subordinates that they could face career consequences for promoting Lippa's campaign. ECF No. 17, ¶¶ 19-20. Lippa asserts that Moser's threat was directed to that election.[2] ECF No. 48, at 1. The Defendants, by contrast, say that Moser's statements were made in a meeting primarily related to a then-pending election in the county for Commonwealth's Attorney.[3] ECF No. 37, at 4. Although they admit that Lippa's name was mentioned, they maintain that the order was directed solely to the Commonwealth's Attorney election and was given because of the close

---

[1] Defendants initially denied that that these statements were made. ECF No. 20, at 4. Their counsel's representations during the hearing held on the MOTION reflected that the Defendants have since reversed that position. The analysis set forth below remains the same regardless.

[2] Specifically, Lippa alleges that Moser said: "We all love Anthony, we know he's running for office, but you have to let your deputies know that if they support a candidate, there could be career consequences." ECF No. 48, at 4.

[3] Lippa states that he does not recall whether the meeting also addressed the Commonwealth's Attorney election but maintains that he was addressed specifically. See ECF No. 48, at 10.

working relationship between the CCSO and that office.[4] ECF No. 49, at 15-16.

Second, Lippa asserts as retaliation that, at Moser's order, Lippa's unmarked police vehicle was transitioned to a newer, marked car of the same make and model in July 2023. ECF No. 17, ¶ 21; ECF No. 37, at 4. In Lippa's view, this action, as applied to his vehicle, "was designed to humiliate him." ECF No. 48, at 10. However, the record is that, in an effort to improve visible police presence in the area, the policy applied equally to all patrol sergeants and, other than Lippa's objections, was generally viewed neutrally. ECF No. 37, at 3 (noting that other sergeants described it as "not a big deal"). It is undisputed that at least two other officers were reassigned to marked cars within the following months. Id. at 4; ECF No. 48, at 11.

The third allegedly retaliatory action relates to a CCSO practice of publishing occasional "Employee Spotlight[s]" on the

---

[4] Defendants assert that Lippa cannot contest their view of Moser's words, because Lippa testified that he did not remember if Moser discussed the Commonwealth's Attorney race. ECF No. 49, at 4; Dancico v. MLT Sys. LLC, No. 1:24-cv-1317, 2026 WL 384341, at *1 n.4 (E.D. Va. Feb. 11, 2026) (finding a fact undisputed because the plaintiff testified to not remembering whether a specific meeting occurred). However, the holding in Danico does not mean that Lippa cannot argue that Moser discussed him; instead, it merely limits Lippa's ability to contest whether the Attorney's campaign was also mentioned at that meeting. Dancico, 2026 WL 384341, at *1 n.4.

social networking website Facebook. ECF No. 17, ¶ 22. The Spotlights seek to increase community engagement with the CCSO and do not involve increased pay or bonus.[5] See ECF No. 37, at 6. Lippa was randomly selected to participate and, at the request of the employee running the program, drafted a brief statement about what information he would like to be included when his time came to be in the Spotlight.[6] Id. at 6-7. After reviewing the draft, Nutter ordered that the Spotlight be delayed until after the election. Id. at 7. Lippa avers that this was done as retaliation for his run for office; The Defendants assert that the office merely wished

---

[5] Lippa alleges that the Defendant's evidence for the lack of career impact lacks foundation, because the officer who testified on that point "does not have proper knowledge" to opine on the issue. See ECF No. 48, at 12. However, Lippa has not alleged that there is some career impact, nor has he presented any evidence tending to prove that point. Id. "When the defendant produces . . . evidence [on an issue], the burden of production shifts back to the plaintiff who 'must come forward with specific facts showing that there is a genuine issue for trial.'" Brinkley v. Harbour Rec. Club, 180 F.3d 598, 614 (4th Cir. 1999) (quoting White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 101 (4th Cir. 1987)). Thus, because Lippa has not shown a genuine dispute over the career effect of a Spotlight, the Court considers that there is no career impact associated with appearing in the Spotlight.

[6] The statement included general biographic information about Lippa, such as his hobbies, job responsibilities, and family life. ECF No. 37-20. It did not mention the campaign. Id. Lippa has variously referred to the amount of effort and time he expended on the profile as both "significant" but also not "very long." ECF No. 17, ¶ 22; ECF No. 37, at 2.

to remain neutral and avoid the appearance of endorsing a particular candidate. ECF No. 17 ¶ 22; ECF No. 37, at 7-8.

Following the election, which Lippa lost, the Spotlight was cancelled entirely. Defendants' Motion, ECF No. 37, at 8, 10. Lippa again alleges that this was done as a form of punishment. ECF No. 48, at 7-8. The Defendants contest this characterization, asserting that the Spotlight was cancelled because, by then, Lippa had faced disciplinary action.[7] ECF No. 37, at 8. It is undisputed that another officer had previously been passed over for the Spotlight due to disciplinary issues. See id. at 8; ECF No. 48, at 13.

Next, in November 2023, Lippa alleges that he was improperly demoted to deputy sheriff and forced to participate in an "embarrass[ing] and humiliat[ing]" familiarization procedure. ECF No. 17 ¶¶ 23-29. The demotion was in response to an interaction between Lippa and one of his deputies, Deputy Natacha Ascasio. ECF No. 37, at 4. Wright alleges that he had informed Lippa that Deputy Ascasio was to be placed on light duty due to an injury, an order that Lippa denies he received. Id. at 4-5. And, contrary to that order, Lippa ordered Ascasio to take a report (a task which officers on light duty may not undertake) and informed her that he

---

[7] Discussed infra.

would "take actions more favorable to her than [those] advised by [his] superiors." Id. at 5. Lippa does not dispute that, under department policy, these infractions could result in suspension or termination. Id.; ECF No. 48, at 11. CCSO initiated an internal investigation to determine the accuracy of the allegations. ECF No. 37, at 10. Lippa, "visibly angry," confronted Ascasio and interrogated her regarding the investigation, resulting in her feeling "intimidated and uncomfortable."[8] Id. at 5-6; ECF No. 11.

In November 2023, Lippa met with Moser and Nutter to discuss his behavior toward Ascasio.[9] Defendants' Motion, ECF No. 37, at 10. In response to a question from Moser asking Lippa what he would do in the same situation, Lippa suggested that, if he were in the Sheriff's position, he would permit an employee who had acted as he had to self-demote to Deputy and be given remedial training.

---

[8] A memorandum drafted by Nutter regarding the incident indicated that, if the events had occurred as described, Lippa had committed two "Group III" offenses. ECF No. 37-16, at 6. A "Group III" offense under CCSO policy may be punished by termination or demotion. Id. at 2.

[9] Lippa says that he disputes the facts relating to this meeting "to the extent the facts . . . are inconsistent with or contrary to the actual facts portrayed in the video." ECF No. 48, at 15. The video to which Lippa refers is a recording of the meeting filed under seal with the Court. The facts presented regarding the meeting are thus undisputed, because they are consistent with the video.

Id. at 11-12. Moser adopted that suggestion and offered Lippa the chance to self-demote, which Lippa accepted.[10] Id.

As part of the training process for his new position, Lippa was ordered to participate in a familiarization period during which he rode along with his new supervisor. The procedure was designed for him to become comfortable in his new position and learn how his shift was run. Id. at 13. Lippa characterizes this procedure as "humiliating" because no other demoted officer had undergone a similar experience. ECF No. 48, at 2. Defendants argue that Lippa was merely given the remedial training that he had suggested. ECF No. 37, at 18-19.

Finally, the last alleged retaliatory act is that Moser denied Lippa's request for holiday leave in December 2023. ECF No. 17 ¶ 30. Lippa now does not dispute that the request was denied because Moser was no longer responsible for reviewing Lippa's leave

---

[10] In relevant part, the conversation went as follows:

> Moser: I'm gonna take your recommendation and give you the option to self-demote, if you want. If you don't, I will demote you. Umm and I'm going to send you through [the ridealong] as a deputy.
> Plaintiff: Ok.
> Moser: So, I'm doing exactly what you said.
> Plaintiff: I don't disagree with you.

ECF No. 54, at 1.

requests. ECF No. 37, at 14; ECF No. 48, at 16. So, this point is no longer part of the evidence of retaliation asserted by Lippa.

**II. Procedural Posture**

Lippa filed this action on October 14, 2025, seeking compensation under 42 U.S.C. § 1983 for alleged violations of his First Amendment rights. See ECF No. 1. On December 23, 2026, Lippa voluntarily dismissed his claim against Caroline County. See ECF No. 7. The remaining Defendants moved for summary judgment on July 31, 2026, arguing that (1) Lippa cannot show enough evidence to establish a First Amendment violation; and (2) even if Lippa could show a violation of his rights, the Defendants are protected by qualified immunity. ECF No. 36.

**LEGAL STANDARD**

**I. Summary Judgment**

The Court may grant summary judgment when a movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute is one where a reasonable jury could find in favor of the nonmoving party. Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013). The Court must both construe the facts and draw reasonable inferences in favor of the nonmoving party. Id. at 312-13. However, the nonmovant must present something more than a mere "scintilla

of evidence" to survive a summary judgment motion. Keeley v. Hines, 782 F. Supp. 3d 292, 299 (E.D. Va. 2025) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). And, of course, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

**II. 42 U.S.C. § 1983 and First Amendment Retaliation**

42 U.S.C. § 1983 permits a suit in federal court against any person who violates rights guaranteed by the United States Constitution or a federal law while acting "under color of" state law. 42 U.S.C. § 1983. The First Amendment to the Constitution, in addition to protecting the right to speak freely, also includes "the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). To establish a case for First Amendment retaliation under § 1983, the plaintiff must plead and prove that "(1) [he] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

An adverse action is one that tends to "chill" the exercise of First Amendment rights. Bhattacharya v. Murray, 93 F.4th 675, 689 (4th Cir. 2024) (quoting Constantine, 411 F.3d at 500). An action chills expression when it "would likely deter 'a person of ordinary firmness' from" speaking on a matter. Constantine, 411 F.3d at 500 (citing cases) (finding adverse action where the defendants determined to give the plaintiff a failing grade on an exam regardless of her actual performance). The plaintiff must show something more than routine procedural actions or "criticism, false accusations, or verbal reprimands"; that is, there must be something "more than 'de minimis inconvenience.'" Suarez Corp., 202 F.3d at 686; Bhattacharya, 93 F.4th at 689 (finding that an employee's complaint about the plaintiff's speech, which could have led to discipline, was not an adverse action because there was no "punitive effect" on its own).

If the asserted adverse action involves the defendant's speech, the Court must balance the First Amendment rights of the speaker with the plaintiff's rights against retaliation. Suarez Corp., 202 F.3d at 688-89. Governments have a strong interest in promoting "'efficiency' and 'effective[ness]'" in the workplace, including through enforcing a policy of official neutrality to political campaigns. Heffernan v. City of Paterson, 578 U.S. 266, 270 (2016) (quoting Waters v. Churchill, 511 U.S. 661, 672, 675

(1994)); United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 551 (1973) (finding constitutional a statute that prevents federal employees from using their official status to affect an election).

In cases that do not involve spreading personal information about an individual, a speech-related action is adverse where it is so "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow." Suarez Corp., 202 F.3d at 689 (finding no adverse action where the defendants allegedly defamed the plaintiff without threatening any particular harm that would "cause[] adversity to" the plaintiff); Hous. Cmty. Coll. Sys. v. Wilson, 595 U.S. 468, 478-80 (2022) (holding that there was no adverse action where the defendant publicly censured the plaintiff without further impact, such as "prevent[ing] [him] from doing his job" or being defamatory). Additionally, "[t]he First Amendment's Free Speech Clause does not prevent the government from declining to express a view." Shurtleff v. City of Boston, 596 U.S. 243, 251 (2022).

The causation requirement is "rigorous." Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015) (quoting Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990)). The plaintiff must show a "but for" connection between the

protected activity and the adverse action. Id. Even where there is evidence that policies were applied inconsistently or incorrectly to the plaintiff, the but-for test requires more than showing that the protected activity was merely "a substantial motivating factor" in the adverse action. Penley v. McDowell Cty. Bd. of Educ., 876 F.3d 646, 657 (4th Cir. 2017). Additionally, there must be "some degree of temporal proximity" to give rise to an inference of causal connection. Constantine, 411 F.3d at 501. The longer the duration between the protected activity and the adverse action, the less likely it is that causation will be found. Id. (finding no causal connection between plaintiff's complaints and the defendant's actions because four months passed between them).

**ANALYSIS**

The Defendants do not contest that Lippa's campaign constituted protected activity for the purposes of a retaliation claim. ECF No. 37, at 15. Thus, the summary judgment determination rests on whether any of the Defendants' conduct was an adverse action and, if so, whether there was a causal nexus between the protected activity and that action. Lippa has not shown that there is a triable issue as to most of the alleged adverse actions. Moreover, there is no causal connection between the protected activity and any of these actions. Therefore, the MOTION will be granted without reaching the qualified immunity question.

Lippa has conceded that he cannot produce sufficient evidence to establish a causal connection between any of Wright's actions and the protected activity. See ECF No. 48, at 21. For that reason, summary judgment will be granted as to Wright.

**I. Moser's Statements at the June 2023 Meeting**

At the June 2023 supervisors' meeting, Moser allegedly told employees that there could be career consequences for supporting Lippa's campaign. The record is that the June 2023 meeting also addressed other political campaigns running at the same time – namely, the then-ongoing race for Commonwealth's Attorney. See supra notes 3-4. There is no genuine dispute of material fact as to whether this conduct constituted adverse action because there was no chilling effect targeting Lippa's First Amendment right to run for public office. And, in any event, Lippa also cannot show the causal connection requirement because the words were, in part, motivated by other elections.

Lippa has not produced any evidence from which a reasonable jury could find that Moser's "career consequences" statement would reasonably have deterred Lippa from continuing to exercise his First Amendment Right to run for office. At the meeting, Moser declared a policy that officers should not publicly support election campaigns. See supra notes 3-4. A reasonable person in Lippa's position would not be dissuaded by this statement from

continuing to run in an election. Indeed, Lippa continued to operate his campaign following the statement, and the CCSO enabled him to do so by giving him time to campaign. See ECF No. 37, at 10. Lippa has not presented any evidence that a fellow officer was dissuaded from supporting the campaign. In fact, following the meeting, two coworkers expressed willingness to help Lippa notwithstanding Moser's statement.[11] See ECF No. 48-1, at 10-11 (noting one officer mentioned "he was just happy to help" however he could).

The record demonstrates that Moser's comments do not qualify as adverse action. See Suarez Corp., 202 F.3d at 689 (requiring that speech intimate immediate punishment to qualify as adverse action). Like Bhattacharya, where a complaint about the plaintiff that, standing alone, carried no disciplinary impact was not an adverse action, a statement that officers may suffer career consequences for opining publicly on elections is not equivalent to a sanction for such conduct. See Bhattacharya, 93 F.4th at 689. And Lippa's own documents — see, e.g., ECF No. 48-4, at 23 (CCSO employee testifying that no one said anything negative about

---

[11] Lippa testified that he did not ask them to help due to the fear they would be treated differently in the office. See ECF No. 48-1, at 10-11. However, their desire to assist is evidence that a reasonable person would not have been deterred from speaking on the matter. See Constantine, 411 F.3d at 500.

Lippa's campaign) — as well as the evidence presented by the Defendants, see, e.g., ECF No. 37-11, at 3 (CCSO official testifying that no one in leadership disparaged the campaign), show that other CCSO staff never heard anything about Lippa or his campaign that they thought might dissuade them from helping him run.

Moreover, balancing the First Amendment speech rights of Moser — the face of the CCSO — and Lippa shows that the comments did not constitute an adverse action. The CCSO has the right to decline to speak on a matter, see Shurtleff, 596 U.S. at 251, and, by way of Moser's statements, it evinced a policy that its employees should not act in a way to intimate that the CCSO endorsed a particular candidate. As in United States Civil Service Commission, the government may constitutionally limit political activity by its employees in their official capacities that may tend to influence elections. See United States Civ. Serv. Comm'n, 413 U.S. at 550, 563 (noting that "all 50 states have restricted the political activities" of governmental employees to prevent improper impacts on voting).

Furthermore, even if the speech was an adverse action, the causal connection facet of the claim would not be met. Assuming that the policy was partially motivated by animus toward Lippa, the statements presented by Lippa do not satisfy the onerous "but

for" causation test, see Raub, 785 F.3d at 885, because it is undisputed that the statements were also in relation to the Commonwealth's Attorney election. See supra note 4. Lippa's candidacy was, accordingly, at best a "substantial motivating factor" in creating the policy, rather than the but-for cause. See Penley, 876 F.3d at 656.

Therefore, Moser's statements about supporting elections did not violate Lippa's First Amendment rights.

**II. The Employee Spotlight**

Delaying the Employee Spotlight does not qualify as adverse action. As explained above, the CCSO has a right to decline to express a particular view to the public, particularly as it relates to commenting on elections. See supra Section I; Shurtleff, 596 U.S. at 251. A slight delay in publishing a Spotlight on Lippa until after the election would cause, at most, a minimal impact on Lippa's First Amendment rights, because the statement would still eventually have been published, and he may not have even known about the delay.[12] See Bhattacharya, 93 F.4th at 689 (noting that

---

[12] It is unclear whether Lippa even knew that the statement would be delayed. He never alleges that he was told that it would be delayed before the election, only that he was not informed it would be cancelled. See ECF No. 48, at 8; ECF No. 48-1, at 22-23. The official responsible for making the posts does not recall informing him of the delay. See ECF No. 48-4, at 30-33. Even if he had been told, however, there remains no genuine dispute as to whether this was an adverse action.

"de minimis" actions toward the plaintiff are not sufficiently severe to qualify as adverse).

The subsequent cancellation of the Spotlight is similarly insufficient. In Wilson, the Supreme Court held that a public censure of the plaintiff was not severe enough to qualify as adverse action because there was no real impact on his employment. See Wilson, 595 U.S. at 478-80. Here, the Spotlight served only a community outreach role and did not result in increased pay, opportunity for promotion, or any other positive employment consequence, so its cancellation is even less significant than Wilson's public censure. See supra note 4. Therefore, the choice to skip over Lippa's Spotlight did not "prevent [him] from doing his job" or create any real adverse effect regarding his employment. Wilson, 595 U.S. at 479. The selection of the Lippa for the Spotlight also was not publicly known, so the cancellation did not cause any reputational harm. See id. (noting that publicly damaging an employee's reputation could constitute an adverse effect); ECF No. 37, at 17.

Nor does the record show that Lippa's protected activity was causally connected to the cancellation of the Spotlight. Lippa only disputes the reason for the delay and cancellation to the extent that it was "in part" motivated by retaliation. ECF No. 48, at 12. Even assuming that the Spotlight was in part cancelled to

punish Lippa for running for office, Lippa has acknowledged that his disciplinary issues were also an adequate ground for the cancellation decision. Because the Spotlight would have been skipped even if Lippa had not run for office, Lippa cannot be found to have presented sufficient evidence for a jury to find that there was a but-for causal connection between his protected activity and this action. See Raub, 785 F.3d at 885; ECF No. 37, at 8 (indicating that Spotlights had previously been skipped for disciplinary issues).

**III. Transition from an Unmarked to a Marked Vehicle**

Moving Lippa to a marked patrol vehicle is not an adverse action because it would not deter a reasonable person from exercising the rights secured by the First Amendment. Alongside all other patrol sergeants, Lippa was reassigned to a newer car of the same make and model. ECF No. 17, ¶ 21. Unlike Constantine, where the defendants predetermined that the plaintiff would fail a course regardless of exam performance, a reasonable person would not limit their expression because they are given an improved vehicle. See Constantine, 411 F.3d at 500. The reaction of the other officers who changed vehicles – that it was "not a big deal" – exemplifies that this neutral policy does not constitute adverse action. ECF No. 37, at 3.

As with the previous actions, the car policy also lacks a causal connection with the protected activity on which Lippa rests his claim. Although Lippa disputes the true motivation for the new policy, Moser stated at the time that he sought to increase visible police presence in the county, and it is undisputed that other officers were transitioned to the marked cars at around the same time. See ECF No. 48, at 10; ECF No. 37, at 3. In sum, the record contains uncontroverted testimony that the transition was enacted because of reasons other than targeting Lippa running for office, and Lippa has failed to submit any evidence on this point. See Felty, 818 F.2d at 1128 (finding that mere conjecture is not grounds to deny a motion for summary judgment). Under these facts, no reasonable jury could find that a causal connection existed, and, therefore, there is no genuine dispute of material fact. See Judd, 718 F.3d at 313.

**IV. Lippa's Self Demotion and Familiarization Procedure**

As a whole, demoting Lippa and enforcing remedial training might constitute adverse action if done to punish Lippa for his expression. See Heffernan, 578 U.S. at 268-70 (finding that a demotion was adverse action). Nonetheless, the Defendants have established that there is no genuine dispute of material fact regarding the causal connection between the demotion/ridealong and Lippa's campaign.

Lippa does not challenge that: (1) there was a dispute over whether he was ordered to keep Ascasio on light duty; (2) if he had violated that order, he could be subject to termination; (3) that he angrily confronted Ascasio about the dispute; and (4) that such offense could also render him subject to termination. See supra note 8 and accompanying text.

There also is no genuine dispute that Lippa suggested self-demotion and remedial training and that Moser merely adopted that suggestion. See supra notes 9-10 and accompanying text. Lippa has not put forth any evidence that the demotion was taken to retaliate against him for his campaign, offering only the sort of "[u]nsupported speculation" that is insufficient to defeat summary judgment. Felty, 818 F.2d at 1128. There is thus no genuine dispute that the discipline imposed on Lippa was predominately, if not completely, due to Lippa's own admitted misconduct and suggested responses. See Judd, 718 F.3d at 313.

Moreover, there is little temporal proximity between these acts and the protected activity. Moser allegedly first stated his irritation about Lippa's campaign in April 2023. See ECF No. 48, at 2. He allegedly also informed officers not to support the campaign in June 2023. See ECF No. 17 ¶¶ 19-20. It was not until November of that year, at least five months later, that the self-demotion and training took place. This extensive period further

attenuates any potential causal connection between Lippa's candidacy and any retaliatory action. See Constantine, 411 F.3d at 501 (finding no causal connection when four months passed between the plaintiff's initial complaints and the adverse action).

The demotion and training decisions were primarily made based on Lippa's misconduct and were temporally distant from any of the Defendants' expressions of antipathy, to the extent they existed. Therefore, Lippa cannot establish a causal relationship between his campaign and the demotion, because retaliation was at best a small motivating factor rather than the but-for cause of the action. See Raub, 785 F.3d at 885.

**V. Moser's Denial of Holiday Leave**

Moser denying a request for holiday leave in retaliation for expression could be an adverse action. A reasonable person may feel punished for speech if made to do additional work that otherwise would not have been required. See, e.g., Tao v. Freeh, 27 F.3d 635 (D.C. Cir. 1994). However, Lippa does not dispute that Moser denied the request simply because he was no longer the appropriate official to make the determination. Therefore, because Lippa's candidacy was not a but-for cause of the denial, there is no causal connection between the protected activity and this action. See Raub, 785 F.3d at 885.

## CONCLUSION

Because most of the asserted adverse actions were, in fact, not adverse, and because any that could possibly be considered as adverse have not been causally connected to Lippa's protected activity, his claims fail. For the foregoing reasons, the MOTION will be granted, the Court will enter judgment in favor of the Defendants, and the action will be dismissed with prejudice.

It is so ORDERED.

/s/ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 24, 2026